**ORIGINAL**

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

JASON BARBOUR,
KAI J. TYLER,
DAVID GAYDEN,
MARK ESTRADA, and
DEREK CARVER

CASE NUMBER: 1:11-MJ-676

FILED IN CHAMBERS
U.S.D.C.    Atlanta

MAY 0 4 2011

JAMES N. HATTEN, Clerk

By: _____

Deputy Clerk

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on a date unknown, but at least by 2010, and continuing up to and including April, 2011, in Fulton County, in the Northern District of Georgia and elsewhere, defendant(s) did

knowingly and intentionally conspire and agree with each other to possess with the intent to distribute a controlled substance, namely marijuana, a Schedule I controlled substance, said conspiracy involving more than 100 kilograms of marijuana

in violation of Title 21 United States Code, Section(s) 846 and 841(b)(1)(B)(vii).

I further state that I am a(n) FBI Special Agent and that this complaint is based on the following facts:

Please See Attached Affidavit

Continued on the attached sheet and made a part hereof.        (X) Yes ( ) No

Signature of Complainant
Special Agent Dante L. Jackson

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendants have committed it. Sworn to before me, and subscribed in my presence

May 4, 2011 _____    at    Atlanta, Georgia _____
Date                                                          City and State

Russell G. Vineyard
United States Magistrate Judge
Name and Title of Judicial Officer            Signature of Judicial Officer
AUSA Jeffrey A. Brown/ (404) 581-6064

## AFFIDAVIT

I, Dante Lamar Jackson, a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, being first duly sworn, depose and say as follows:

## Introduction

1.    I am an "investigator or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    I am currently employed as a Special Agent with the FBI and have been so employed since July 2004. I am currently assigned to the Atlanta Criminal Enterprise Task Force, and have participated in the investigation of violent street gangs for the last five (5) years. The Atlanta Criminal Enterprise Task Force is compromised of agents and officers from federal, state, and local agencies, including the FBI, City of Atlanta Police Department (APD), DeKalb County Police Department, City of Forest Park Police Department, Alpharetta Police Department, Gwinnett County Police Department, Cobb County Police Department, and Internal Revenue Service (IRS). Prior to my employment as a special agent with the FBI, I worked as an intelligence analyst for the FBI in the Houston, Texas Field Office, assigned to the Field Intelligence Group, Colombian Organized Crime Branch, from November 2001 to July

2004.  I have participated in drug trafficking investigations both as an intelligence analyst and special agent for the past nine (9) years, and through such investigations, have become familiar with the patterns of activity of drug traffickers, and the methods, language, and terms that are used by drug traffickers both to conduct, and to disguise, their illegal dealings.

3.   In connection with my official FBI duties, I have investigated criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 960 and 963, and Title 18, United States Code, Sections 371, 924(c), 1952, 1956 and 1957.  I have received specialized training in the enforcement of drug laws and in the investigation of drug trafficking and drug organizations, including undercover operations, interviewing techniques, financial/money laundering investigations, and the use of electronic surveillance.   In addition, during my tenure with the FBI, I have also received training in the identification of drug traffickers, and many of the techniques they use to conceal, convert, transmit, and transport their drug proceeds, including but not limited to, the use of carriers to transport currency and proceeds, the use of third parties to purchase or hold title to assets, and the use of off-shore accounts. I am personally familiar with, and have used all normal methods of investigation during my FBI tenure,

2

including, but not limited to, visual surveillance, electronic surveillance, informant and witness interviews, and undercover operations.

4. Based upon my training and experience, as well as consultation with other experienced investigators in the FBI and other agencies, and based upon interviews I have conducted with defendants, informants, and other witnesses to, or participants in, drug trafficking activity, I am familiar with many of the ways in which drug traffickers conduct their business. These methods include the various means by which drug traffickers distribute drugs, use cellular telephones, use digital display paging devices and calling cards to facilitate drug activity, and use numerical codes and code words to conduct drug transactions.

5. Throughout this affidavit, I express beliefs about the significance of conversations. These beliefs are based upon my training and experience and participation in this and other investigations, as well as my discussions with other FBI agents and law enforcement officers who participated in this investigation.

6. The information contained in this affidavit is based upon my personal investigation and upon information supplied to me by other law enforcement officials and by a confidential source. The information is also based upon my review of consensually recorded telephone calls and in-person meetings, as well as calls intercepted pursuant to federal court authorized wiretaps.

3

Whenever I state that a telephone call or meeting was recorded, it should be noted that I have listened to and/or watched the recording. With regard to the conversations discussed, it should be noted that the quotations are preliminary. Final transcripts have not been prepared, and thus the exact words used in the quotations are subject to change.

7.   This affidavit is in support of a criminal complaint against the following individuals (collectively, for violations of Title 21, United States Code, Section 846: Conspiracy to Possess a Controlled Substance, namely marijuana, With the Intent to Distribute:

a.   JASON BARBOUR ("BARBOUR");

b.   KAI J. TYLER ("TYLER");

c.   DAVID GAYDEN ("GAYDEN");

d.   MARK ESTRADA ("ESTRADA"); and

e.   DEREK CARVER ("CARVER").

8.   This affidavit is intended to show that there is sufficient probable cause for the requested complaint, and does not purport to set forth all of my knowledge of, or investigation into, this matter.

## Background of Investigation

9.   Since approximately February 2010, FBI-Atlanta has been conducting an investigation into the illegal drug trafficking/money laundering activities of BARBOUR and members of his drug

4

trafficking organization ("DTO").   Through this investigation, I have learned that BARBOUR and his DTO arrange for marijuana to be flown from the west coast to various cities throughout the United States (including Atlanta, Georgia) via private aircraft, and, later, for the proceeds from the sales of the marijuana to be flown back to the west coast.

10.   On February 17, 2010, the Drug Enforcement Administration (DEA) executed a federal search warrant on BARBOUR's residence in Manhattan Beach, California.   The search warrant was the result of an investigation into a cocaine trafficking ring operating out of Fresno, California.   During the search, agents located drug ledgers, multiple cellular telephones, $173,000 in U.S. currency, money bands, and a money counter.   I reviewed these drug ledgers which indicated large transactions and nicknames identifying BARBOUR's customer base.   Although the DEA also had an arrest warrant for BARBOUR, his whereabouts at that time were unknown.

11.   Meanwhile, in February of 2010, FBI-Atlanta was involved in a drug trafficking investigation that included TYLER.   During this investigation, agents discovered that TYLER had recently established BARBOUR as a new marijuana source of supply.   TYLER informed a cooperating witness (CW)[1] that BARBOUR was the subject

---

[1] The CW is cooperating for the purposes of obtaining monetary reward for any information the CW provides which is deemed credible and furthers any on-going criminal investigations.   The CW has no pending state or federal criminal charges; however, the CW has been convicted of Check Fraud

of a DEA investigation, and that a warrant had been issued for his arrest in the Eastern District of California for federal drug trafficking charges.  TYLER presented the CW with a federal court case number related to BARBOUR's federal investigation, and requested the CW obtain any information he/she could access regarding the Criminal Complaint filed in the Eastern District of California.

12.  Utilizing the court federal case number provided by TYLER, agents were able to locate and contact agents assigned to the DEA-Fresno Resident Office who advised there was an active warrant for BARBOUR's arrest within their district.  The DEA-Fresno agents explained that BARBOUR's drug trafficking network extended over several U.S. cities and Vancouver, Canada, where it was believed BARBOUR had entered into an agreement with members of the Hells Angels Motorcycle Gang to supply them with cocaine in exchange for high-grade marijuana.  The DEA-Fresno agents described

_____

(Deposit Account/Bad Checks) on 12/30/1993; Theft By Taking on 02/27/1995; Theft By Taking 06/13/1995; Credit Card Fraud on 03/17/1990; Conspiracy to Defraud (Charge 1); and Making False Statements on Loan Application (Charge 2) on 07/17/1993.  The information detailed in this affidavit and has generally been corroborated with consensual recordings or other independent information, such as documentary evidence and information from other confidential witnesses who the CW does not know.  The CW has been cooperating with law enforcement for approximately eight (8) years.  The CW's information has led to the successful indictment and subsequent arrest of several individuals in the past.  To my knowledge there is nothing that would negatively impact the CW's credibility that is not contained in this affidavit.

their investigation, which confirmed information TYLER provided the CW in an April 30, 2010, recorded meeting.  During the meeting, TYLER informed the CW that BARBOUR "had something sweet going on when he was moving them t-shirts out of the west coast right.  His Hells Angels dude was picking up like 20 t-shirts a day...he was making like $800 off every t-shirt."  I believe that, during the portion of the conversation, TYLER told the CW that, at one point, BARBOUR was supplying members of the Hells Angels Motorcycle Gang with 20 kilograms of cocaine ("20 t-shirts") on a daily basis. Furthermore, I believe that TYLER informed the CW that BARBOUR's profit was approximately $800 per kilogram sold.

13.  After several discussions among the relevant government agencies, the U.S. Attorney's Office in the Eastern District of California agreed to dismiss the complaint filed against BARBOUR to allow the current FBI-Atlanta investigation to continue.  Following the dismissal, TYLER contacted the CW to advise the CW that the charges against BARBOUR had been dismissed, and BARBOUR was seeking to re-establish his drug trafficking organization.  TYLER advised that in an effort to avoid law enforcement detection, BARBOUR had decided to discontinue utilizing any credit cards and would no longer travel utilizing a commercial airline.

**September 22, 2010 Purchase of Marijuana**

14.    On September 3, 2010, the CW placed a recorded telephone call to TYLER to schedule a drug transaction between TYLER and an FBI undercover employee ("FBI UCE1") (referred to as "Baltimore" or "B-More").  During the conversation, the CW told TYLER that he/she "had hit B-more up earlier and hum he said he want to come down and grab five (5) of them thangs at the.. you said they still 53?" TYLER responded "Uh-huh."  I believe that, during this portion of the conversation, the CW informed TYLER that FBI UCE1 was seeking to travel to Atlanta, Georgia to purchase five (5) pounds of marijuana from TYLER at the set price of $5,300 per pound.  TYLER agreed to the price.  The CW then told TYLER that he/she would contact FBI UCE1 to find out when FBI UCE1 was planning on coming to Atlanta.  The CW told TYLER he/she would call back in a few minutes.

15.    Shortly after, the CW contacted TYLER.  During the recorded conversation, the CW told TYLER that it would take FBI UCE1 "about a week and half, two weeks to get down here but he want to know if you can do a little bit better on that number."  TYLER asked "Yea, like what?" and the CW responded, "Shit you know, you know what we at now."  TYLER stated, "Yea tell him I'll take him down a buck."  I believe that, during this portion of the conversation, the CW informed TYLER that FBI UCE1 would be traveling to Atlanta, Georgia to complete the transaction in the

8

upcoming weeks; however, FBI UCE1 wanted to know prior to travel if TYLER would reduce the price per pound of marijuana.   TYLER then agreed to reduce the price of the marijuana by $100 per pound ("a buck").   The CW later confirmed, "So 52 is good?" (TYLER would sell the marijuana at $5,200 per pound) and TYLER responded "Yes sir."

16.   On September 22, 2010, the CW contacted TYLER to advise TYLER that FBI UCE1 was in Atlanta, Georgia and prepared to purchase the five (5) pounds of marijuana at the set price of $5,200 per pound.   Initially, the CW instructed TYLER to travel to the Home Depot located at 815 Sidney Marcus Blvd., Atlanta, Georgia to conduct the transaction; however, TYLER informed the CW there was a high concentration of law enforcement officers regularly patrolling that area and that it would safer to conduct the transaction at a different location.   TYLER then requested the CW and FBI UCE1 come to Royal Treatment Window Tinting (TYLER's business), on Piedmont Road in Atlanta, Georgia, to conduct the transaction.

17.   Upon arrival, surveilling agents observed TYLER greeting FBI UCE1 and CW.   During the recorded meeting, FBI UCE1 provided TYLER with a brown bag containing $26,000 in U.S. currency, at which time TYLER instructed the CW to open the rear passenger door of his Porsche Cayenne and remove a black duffle bag from inside. The CW removed the bag and placed it in the rear passenger seat of the rental vehicle driven by FBI UCE1.   At the conclusion of the

transaction, agents met with FBI UCE1 and took custody of the black bag.  Subsequent to taking custody of the bag, agents observed four vacuum sealed bundles of suspected marijuana weighing approximately 2,971 grams.  Agents transported the bag back to the FBI-Atlanta Headquarters where each bundle was weighed and placed in evidence. The bundles were later sent to the DEA Laboratory where they tested positive for marijuana.

## Transportation of Marijuana into Atlanta via Aircraft

18.  TYLER has informed the CW that BARBOUR utilizes private aircraft to transport both his drugs and illegal drug proceeds. TYLER informed the CW that he has met the pilot to pick-up drugs at BARBOUR's behest.

19.  On December 5, 2010, a call between TYLER and BARBOUR was intercepted pursuant to a court ordered wiretap issued in the Northern District of Georgia.  During the call, the following conversation occurred:

BARBOUR: "...Just depends on the weather - the dude will make it in, but more than likely he'll make it in.  He wasn't too far away... There is going to be like 240 in there, so you know that's quite a bit of luggage.  ...figure out getting a big ride take the seats out or go rent one of those ah Dodge fuckin Caravans or something or a Nissan or a Toyota van and take the seats out of the little soccer van."  I believe that during this portion of the call, BARBOUR is

informing TYLER that a shipment of 240 pounds of marijuana is arriving into Atlanta on an aircraft. BARBOUR is suggesting to TYLER that he rent a vehicle large enough to accommodate the shipment of marijuana for transport. BARBOUR later asks TYLER "…. How much paperwork do you have though?" To which TYLER responds " …I am going to do a count and let you know. It's not that much. It might be 30 or 40 thousand. It's not even really that much. BARBOUR responds "...Oh wow this dude is probably going to trip on me." I believe during this part of the call, BARBOUR is asking TYLER how much money he has to send back on the plane. TYLER is telling BARBOUR he only has 30 or 40 thousand dollars. BARBOUR is concerned that his source of supply is going to be unhappy with the amount of money being delivered to him.

20. Approximately thirty minutes later, on December 5, 2010, BARBOUR tells TYLER in an intercepted call, "He is already here right now. He doesn't like to do it until its dark out." I believe during this portion of the conversation BARBOUR is informing TYLER that the individual scheduled to meet with TYLER to transfer the 240 pounds did not want to meet until the  evening in an effort to avoid law enforcement detection.

21. Data from a court ordered (Eastern District of California) tracking device placed on a Beechcraft Turbo-prop by DEA- Seattle showed that the plane arrived into Tara Field in Clayton County on December 5, 2010. The plane, with tail number

N22216, is registered to Michael Murphy in California.   The plane
had been suspected of transporting drugs and proceeds for BARBOUR's
drug trafficking organization.

22.   On December 5, 2010, a call between TYLER and Michael
Murphy was intercepted pursuant to a court ordered wiretap issued
in the Northern District of Georgia.   During the call, the
following conversation took place:

Murphy tells TYLER   " You know I'm here obviously so um.   What  I
am going to do when it gets a little later.   I am going to go out
and put it into my little rental van you know and um come back into
the usual spot.   And as long as you have a rental van.   I think I
have about one, two, three, four, five, six.   I think I got six
bags plus I got a box and I have a couple big garbage bags with
some special stuff in it.   TYLER responds "Oh wow, okay.   Alright.
Cool.   No worries.   Okay.   Let me make my preparations and I'll
talk with you soon."   Murphy continues "Yeah cause I don't know
exactly what there's there but there is probably, I don't know it
sounds like.   Sounds like a couple and a half.   You know."   TYLER
responds "Yeah.   Yeah.   It does.   Definitely.   Definitely does.
That's what.   That's kind of the word I got."   I believe that
during this part of the conversation, Murphy is telling TYLER that
he is transporting the marijuana in a rental van and will transfer
it to TYLER.   Murphy has six bags, a box and two garbage bags which
equal about 250 pounds ("a couple and a half").   TYLER confirms to

Murphy that it is consistent with what he has been told by Barbour earlier in the day ("That's kind of the word I got") when BARBOUR told TYLER "There is going to be like 240 in there, so you know that's quite a bit of luggage."  During the same conversation, Murphy also asks TYLER "Are you dropping anything off to me today or tomorrow?"  TYLER responds "Probably both".  I believe that the two are discussing the drop off of money.

    23.   Approximately eight minutes after TYLER spoke with MURPHY, a call was intercepted between BARBOUR and TYLER pursuant to a wire tap authorized in the Northern District of Georgia. During the call, the following conversation occurred:

TYLER says to BARBOUR "Yeah he told me what he had or whatever like that.  Um, but he said he has two garbage bags of some special stuff.  What he talkin about?"  BARBOUR responds,  "Oh that's the green crack.  That's off the hook dude.  It's off the hook.  Bag it.  He couldn't even keep it in the woods it was so stinky." TYLER tells BARBOUR "Okay.  That shit is going to fly off the shelf."  BARBOUR retorts "It is going to be like the new 2010, ah 2011 Cush out here you know.  Because they never had it like this." TYLER says "I can't wait to bring it to the market."  I believe that during this part of the conversation, TYLER is asking BARBOUR about the two garbage bags MURPHY previously told him about. BARBOUR explains that it is "Green Crack", which is a term I know is used for a hybrid marijuana plant that is commonly referred to

as "GC"). BARBOUR and TYLER both agree the Green Crack will be very marketable.

24. On December 5, 2010, FBI-Atlanta agents conducted surveillance on TYLER while intercepting his telephone calls. At approximately 7:30 PM, TYLER was observed leaving his residence at 355 Drivers Circle Court, Johns Creek, Georgia and traveled to the Hilton Hotel at 1031 Virginia Avenue, Atlanta, Georgia. At approximately 8:45 PM, a white male transferred large hockey bags from a white Dodge Caravan (Missouri license plate PH4A3T) to a white Acura TL driven by a black male, identified as David Gayden. The Acura TL was driven to a house on Walnut Street in Atlanta, Georgia. The wire intercept of TYLER's telephone revealed that the driver of the Acura was unable to fit the entire load in his vehicle and would have to return for a second pick-up. The white Acura TL returned to the Hilton Hotel parking lot where the remaining bags were transferred from the Dodge Caravan to the Acura TL.

25. On December 6, 2010, BARBOUR called TYLER. TYLER explained to BARBOUR that he and D stayed up late last night - counting 236 plus 5. TYLER tells BARBOUR that there are 18 GCs. BARBOUR tells TYLER there should be 19 GCs. BARBOUR tells TYLER that the GCs are $4,000 (per pound). TYLER tells BARBOUR that he is gonna try to move them for $4,500.

26.   DAVID GAYDEN (GAYDEN), TYLER's associate, resided at 441 Walnut Street, Atlanta, Georgia.   Georgia Department of Motor Vehicle records showed that GAYDEN has a 2005 white Acura TL registered in his name.

**SURVEILLANCE OF DERECK CARVER**

27.   On December 7, 2010, agents with the California Department of Justice, Bureau of Narcotic Enforcement and Immigration and Customs Enforcement (ICE) conducted surveillance on two subjects identified as Michael Patrick Murphy and David Earl THOMPSON respectively.   Both THOMPSON and MURPHY were identified during the course of investigation as being known money and drug couriers for Jason BARBOUR.

28.   On December 7, 2010, agents established surveillance at the Yuba County Airport, located at 1364 Sky Harbor Drive, Olivehurst, California.   During surveillance agents observed THOMPSON push a burgundy airplane (Airplane Tail #2668M) inside the hangar area.   The aforementioned airplane was observed by agents in Atlanta during the meeting between MURPHY and TYLER described in above paragraphs 18 - 26.   Shortly thereafter agents observed THOMPSON enter a white Chevrolet pick-up truck (Tag Number 7N63429) carrying a large black duffle bag and exit the airport area.   After observing THOMPSON leave the airport agents changed surveillance locations to the Sacramento Airport located at Power Line Road and I-5.   While conducting surveillance agents observed MURPHY arrive

15

at the airport.   Agents surveilled MURPHY as he departed the
airport in a Ford F-250 pick-up truck (USB36TC).   MURPHY eventually
arrived at the hangar located at 1364 Sky Harbor Drive, Olivehurst,
California.   MURPHY proceeded to park in the rear of the hangar
area.   After several minutes MURPHY was observed opening the rear
passenger door of his vehicle and place two items inside the
vehicle to include a large black bag.   Subsequent to loading the
bag in his vehicle agents observed MURPHY leave the airport hangar
and travel to his residence located at 13518 Lake Wildwood Drive,
Penn Valley, California.   Upon arriving at his residence MURPHY was
greeted by a white female, later identified as Pamela Maria MURPHY,
who assisted MURPHY by carrying a large black hockey type duffle
bag into the residence.

29.   On December 11, 2010, agents conducted surveillance at
the 13518 Lake Wildwood Drive address.   During the surveillance
agents observed MURPHY departing the residence in a silver Toyota
Corolla, California license plate number 4ZEG940.   Shortly
thereafter agents lost sight of MURPHY in the area of Pleasant
Drive and Highway 120.   A GPS ping of MURPHY's cellular telephone
would later reveal MURPHY was in the area of Highway I-5 near the
city of Los Banos.

30.   On   January   20,   2011,   agents   again   established
surveillance on MURPHY after observing him arrive at the Yuba
County Airport.   Agents observed MURPHY depart the airport and

16

travel southbound on Interstate Hwy 5.  Agents surveilled MURPHY as he exited off Interstate Hwy 5 and eventually arrived at 1903 Speyer Lane, Redondo, Beach California.  Agents observed MURPHY meet with an unknown white male, later identified as Derek CARVER.  CARVER was observed removing a large black duffle bag from the trunk of MURPHY's vehicle.  Shortly thereafter MURPHY departed the residence.

### January 7, 2011 Seizure of $27,520

31.  On approximately January 5, 2011, the CW received information that one of BARBOUR's associates would be traveling from Atlanta to Los Angeles with a large amount of U.S. Currency.  The associate was identified as ESTRADA from the Los Angeles, California area.  Reservations for a return flight to Los Angeles, California from Atlanta Hartsfield-Jackson Airport on Delta Airlines on Friday, January 7, 2011 were found for ESTRADA.

32.  On January 7, 2011, members of the Clayton County Police drug interdiction team approached ESTRADA at Atlanta Hartsfield-Jackson Airport.  ESTRADA consented to the search of his carry-on and check-in luggage.  Despite claiming that he was not carrying large amounts of U.S. Currency, $27,520 was found in his laptop computer bag and his suitcase.  The U.S. Currency in ESTRADA's suitcase was hidden in a false lining.  ESTRADA claimed he was in Atlanta on business visiting JASON BARBOUR, but described BARBOUR

17

as a black male (BARBOUR is Caucasian).  The U.S. Currency found in ESTRADA's possession was seized.

33.  On January 7, 2011, the CW placed a call to BARBOUR after being informed by BARBOUR's associates that money had been seized at the airport.  BARBOUR described ESTRADA's experience at the airport and the seizure of the money.  BARBOUR expressed his concern that ESTRADA's name had been flagged at the airport because of his affiliation with him.

**SEARCH WARRANT AT CARVER'S RESIDENCE**

34.  On April 28, 2011, agents executed a state search warrant at CARVER's residence in Los Angeles, California in connection with another investigation.  During the search, agents recovered approximately 124 pounds of marijuana, $10,000, two handguns and drug ledgers.  A review of the ledger documents detailed marijuana received by BARBOUR's DTO and proceeds delivered from BARBOUR's DTO since approximately October 2010.

35.  The drug ledgers found at CARVER's residence included entries for the money seizure from ESTRADA at the Atlanta Hartsfield-Jackson International Airport in January of 2011.  One entry read "Paid for 10GC on 2/2 We owe for 22 - 27,000 lost airport Marley". "Marley" is a known alias of ESTRADA.  The ledgers seized from CARVER's residence include references to "Marley", quantities of marijuana and amounts of U.S. Currency.

18

## Conclusion

36.   Based on the facts contained in this affidavit, I believe
that there is probable cause to believe that

       a.   JASON BARBOUR;

       b.   KAI J. TYLER;

       c.   DAVID GAYDEN;

       d.   MARK ESTRADA; and

       e.   DEREK CARVER.

did knowingly conspire to possess a controlled substance, namely
marijuana, a Schedule I controlled substance, with the intent to
distribute.